**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

FILED

02 JAN -9 AM II: 13

U.S. ~~DISTRICT COURT~~
N.D. OF ALABAMA

| | |
|---|---|
| **SANDRA MILLER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **GREAT BARRIER INSULATION** | ) |
| **COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

Civil Action No. CV 00-S-2972-NE

ENTERED

JAN 0 9 2002

**MEMORANDUM OPINION**

Plaintiff, Sandra Miller, alleges that her former employer, Great Barrier Insulation Company,

subjected her to a sexually hostile work environment, and then discharged her in retaliation for her

complaints about such harassment, all in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq.* Plaintiff also has asserted state law claims of invasion of

privacy, negligent training or supervision, and negligent retention of employees.[1] The case presently

is before the court on defendant's motion for summary judgment and plaintiff's motion to strike.

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that

the motion for summary judgment should be granted, but only in part, and the motion to strike

denied.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is

proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

---

[1] Plaintiff's complaint also contained a claim alleging that her termination violated the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601-2619. Complaint (doc. no. 1), ¶¶ 25-32. Upon joint stipulation of the parties, however, this court dismissed all claims based upon that statute with prejudice on May 22, 2001. (*See* doc. no. 37.)



56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

## I. SUMMARY OF FACTS

In addition to the work its name obviously implies, Great Barrier Insulation Company provides a number of unusual services for industrial customers: *e.g.*, asbestos abatement, lead abatement, painting and coating work, and the erection of scaffolding.[2]  The company is headquartered in Birmingham, Alabama, but maintains divisional offices at various locations throughout the South, including one located in Decatur, Alabama. Each divisional office is headed by a Division Manager, who reports directly to the President of the company.[3]

Plaintiff began her employment with Great Barrier during May of 1995, when her husband,

---

[2] Defendant's evidentiary submission (doc. no. 56), Exhibit C (Aycock deposition), at 17.

[3] *Id*. at 14-15.

Clyde ("Sonny") Miller, hired her to work as an "insulator helper" for an ongoing project at the Amoco plant located in Decatur, Alabama.[4]  At that time, plaintiff's husband was an "insulation foreman," working under the direction of Steve Hill, the "insulation supervisor."[5]  Plaintiff was supervised by Hill,[6] and assisted "insulation mechanics".[7]  When the Amoco project concluded during December of 1995,[8]  Great Barrier transferred plaintiff to the Champion Paper Mill in Courtland, Alabama, where the company had a contract for the performance of maintenance services, similar to those it had provided to Amoco at its Decatur facility.[9]  Plaintiff's husband worked for Great Barrier until March of 1998, and periodically worked at the Champion Paper Mill site as an insulation mechanic during 1997.[10]

During plaintiff's employment with the company, Great Barrier divided its hourly employees among three trade, or "craft" groups:  insulation, scaffolding, and asbestos abatement.[11]  Of the fifteen to eighteen hourly employees who worked at the Champion Paper site, approximately four worked in scaffolding, three in asbestos, and the remainder in insulation.[12]  Plaintiff worked primarily in the insulation group, but sometimes with scaffolding employees.[13]

Each trade group had a foreman, who was the immediate supervisor of all employees in that

---

[4] *Id.*, Exhibit A (plaintiff's deposition), at 37, 40-42; *id.*, Exhibit B (C. Miller deposition), at 31.

[5] *Id.*, Exhibit B (C. Miller deposition), at 32.  When plaintiff began her employment with Great Barrier, her husband was employed as a foreman over insulation work at the Amoco plant.  He continued to work for Great Barrier at the Amoco site for approximately three months after his wife began work.  *Id.* at 32-33.  Although plaintiff testified that her husband supervised her at the Amoco plant, he testified that he never served as her supervisor.  *Id.* at 32

[6] *Id.*, Exhibit A (plaintiff deposition), at 40-42; *id.*, Exhibit B (C. Miller deposition), at 32-33.

[7] *Id.*, Exhibit A (plaintiff's deposition), at 44.

[8] *Id.* at 37, 42, 49-50.

[9] *Id.*, Exhibit A (plaintiff's deposition) at 50; *id.*, Exhibit F (T. Smith deposition), at 16.

[10] *Id.*, Exhibit B (C. Miller deposition), at 15-16; *id.*, Exhibit A (plaintiff's deposition), at 80.

[11] *Id.*, Exhibit F (T. Smith deposition), at 10.

[12] *Id.* at 22.

[13] *Id.* at 33-34.

3

crew.  Trade group foremen reported to the "site superintendent."[14]  The site superintendent reported to Jim Smith, the Division Manager of Great Barrier's Decatur, Alabama, divisional office.[15]  During a portion of plaintiff's employment at the Champion Paper site, there also was a "site planner," who was responsible for ensuring that a sufficient number of employees were scheduled to work on each project assigned by Champion Paper to Great Barrier.[16]  The site superintendent and site planner shared supervisory authority and responsibilities, and were considered to be on equal levels.[17]

When plaintiff was first transferred to the Champion Paper Mill job site during December of 1995, Leon Jeffreys served in the dual capacity of insulation foreman and site superintendent.[18]  As insulation foreman, Jeffreys was plaintiff's immediate supervisor.  He continued to occupy both positions until October of 1997, when he left the company.[19]  Jeffreys was replaced as site superintendent by Tim Smith, who previously had been the site planner.[20]  Donald Smith replaced Jeffreys as insulation foreman (and, thereby, plaintiff's immediate supervisor).[21]  Marty Jones, a senior insulation mechanic, occasionally filled in as insulation foreman when Donald Smith was unable to work and on some Fridays.  On such occasions, Jones was responsible for supervising and "pairing" insulators on particular projects.[22]  After Jones was promoted to working foreman in 1997, he occasionally supervised four or five insulators (periodically including plaintiff) on "capital work," which involved maintenance projects that Great Barrier performed for a fixed price, rather

---

[14] *Id.* at 13-16.

[15] *Id.*, Exhibit B (C. Miller deposition), at 21-23; *id.*, Exhibit C (Aycock deposition), at 16, 21.

[16] *Id.*, Exhibit F (T. Smith deposition), at 10.

[17] *Id.* at 9-10.

[18] *Id.*, Exhibit A (plaintiff's deposition), at 62; *id.*, Exhibit E (D. Smith deposition), at 38-39, 55; *id.*, Exhibit H (Jeffreys deposition), at 12-13, 40-41.

[19] *Id.*, Exhibit E (D. Smith deposition), at 38-39, 55; *id.*, Exhibit H (Jeffreys deposition), at 12-13, 40-41.

[20] *Id.*, Exhibit F (T. Smith deposition), at 6-7.

[21] *Id.*, Exhibit E (D. Smith deposition), at 37-38.

[22] *Id.*, Exhibit G (M. Jones deposition), at 14, 34, 38.

4

than an hourly rate.[23]

During plaintiff's employment at the Champion Paper site, Roger Jones was scaffolding foreman, and thereby became plaintiff's immediate supervisor whenever she was directed to assist scaffolding employees.[24]

Great Barrier's hourly employees worked from 7:00 a.m. to 3:30 p.m., Monday through Friday.[25] Each morning, the employees met at the "shop building,"[26] were grouped into "pairs," and assigned tasks for the day.[27] Typically, an experienced mechanic was paired with a "helper," or less experienced mechanic.[28] The paired employees would then gather necessary tools and supplies, and were transported by truck to the area in which they were to work that day.[29] At the designated work area, the more experienced mechanic was responsible for supervising the subordinate employee with whom he was paired.[30]

Great Barrier's Chief Financial Officer, Jeff Aycock, testified that the company had a written sexual harassment policy, and that supervisors were trained on the policy's requirements and procedures.[31] Aycock also said that Great Barrier had mailed a copy of the sexual harassment policy to each employee in 1994. That was prior to plaintiff's employment with the company, however.[32]

---

[23] *Id.* at 10, 140-41.

[24] *Id.*, Exhibit E (D. Smith deposition), at 34.

[25] *Id.* at 32-33.

[26] *Id.*, Exhibit G (M. Jones deposition), at 25.

[27] *Id.* at 48-49. Initially, Leon Jeffreys, the site superintendent, decided which employees would be paired together for a particular day's work. Later this decision was made by the foremen over the different crafts. *Id.*, Exhibit E (D. Smith deposition), at 16-17.

[28] *Id.*, Exhibit G (M. Jones deposition), at 23.

[29] *Id.* at 69.

[30] *Id.* at 23-24; *id.*, Exhibit E (D. Smith deposition), at 20.

[31] *Id.*, Exhibit C (Aycock deposition), at 36-38.

[32] *Id.* at 33-37.

5

Moreover, the employee handbook issued to plaintiff contained no reference to sexual harassment.[33]
Even so, Aycock testified that an updated sexual harassment policy was posted on a bulletin board
at the Champion job site in 1997.[34]  That allegedly posted policy provided in part:

> Any complaint of sexual harassment should be made in writing to Terry Williams,
> Director of Health and Safety, P.O. Box 70247 Mobile, AL 36670.  In determining
> whether such alleged conduct constitutes sexual harassment, the entire record and
> circumstances will be reviewed.  Such matters will be kept in confidence except as
> necessary for resolution.[35]

Plaintiff testified that she never saw a copy of any sexual harassment policy issued by Great Barrier,
however.[36]  Furthermore, her husband, who worked for Great Barrier in a supervisory capacity for
approximately ten years, testified that the first time he saw a copy of any sexual harassment policy
was when his wife brought one home following her deposition.[37]  Additionally, plaintiff's husband
testified that he never received any training regarding his responsibilities as a foreman, in the event
any employee working under his supervision lodged a complaint of sexual harassment.[38]  Similarly,
Leon Jeffreys admitted that he had not received training on sexual harassment, and testified that a
copy of Great Barrier's sexual harassment policy was not posted at the Champion job site during the
period he was employed by the company.[39]  Donald Smith, who succeeded Jeffreys as insulation
foreman at the Champion site, testified that he was not aware Great Barrier had a sexual harassment
policy until 1999.[40]  Roger Jones, who supervised plaintiff when she worked in the scaffolding trade
group at the Champion site, also admitted that he had not received training regarding his

---

[33] *Id.* at 34-36.

[34] *Id.* at 40-43.

[35] *Id.*, Exhibit C (Aycock deposition), exhibit 4 (Sexual Harassment Policy).

[36] *Id.*, Exhibit A (plaintiff's deposition) at 124.

[37] *Id.*, Exhibit B (C. Miller deposition), at 56-57.

[38] *Id.* at 40-43.

[39] *Id.*, Exhibit H (Jeffreys deposition), at 59-61.

[40] *Id*, Exhibit E (D. Smith deposition), at 72.

6

responsibilities, if an employee lodged a complaint of sexual harassment.[41]

### A.   Plaintiff's Sexual Harassment Claims

Plaintiff claims that she was subjected to thirteen specific incidents of sexual harassment, and, regular use of expletives during her employment at the Champion Paper Mill job site.[42] Although plaintiff does not give specific dates for any of the harassing conduct about which she complains, the record clearly establishes that at least two of the incidents took place prior to October of 1997, because plaintiff reported both events to Leon Jeffreys, whose employment with Great Barrier ended during October of that year.[43]

### 1.   Incidents occurring prior to October of 1997

The first incident occurred while plaintiff's husband also was working at the Champion job site.  Toward the end of one Friday afternoon, he was instructed to inspect an asbestos project, and to determine whether work needed to be performed over the weekend, or could be postponed until the beginning of the following work-week.  As he stepped into the cab of his truck to drive to the site, plaintiff said: "you better hush or you're going to have to work this weekend and we won't get to go fishing."[44]  Donald Smith, who was standing nearby and overheard plaintiff's statement, said he would go fishing with her.  Plaintiff was offended, because she interpreted Smith's statement as soliciting a "date."  She reported the incident to Leon Jeffreys, then serving in the dual capacity of site superintendent and insulation foreman.[45]

The second incident arose when James Justice, an insulation mechanic, wore a pair of pants

---

[41] *Id.*, Exhibit D (R. Jones deposition), at 68.

[42] *Id.*, Exhibit A (plaintiff's deposition), at 128-29.

[43] *Id.*, Exhibit H (Jeffreys deposition), at 12-13, 40-41.

[44] *Id.*, Exhibit A (plaintiff's deposition), at 70; *see also id.* at 66.

[45] *Id.* at 65-71.

to work that had a hole in the crotch.  Plaintiff did not know whether Justice was wearing underpants, because she tried not to look.  She asked Leon Jeffreys to instruct Justice not to wear those pants to work.  Jeffreys confronted Justice in the parking lot, and he did not wear the pants again.[46]

### 2.     Incidents occurring prior to February of 1998

The record also establishes that three of the incidents about which plaintiff complains occurred prior to the end of February 1998, because plaintiff mentioned them when she lodged complaints with employees working in the Decatur divisional office during January or February of 1998.

One incident occurred when plaintiff and Donald Smith walked out of Jeffreys' office. Marty Jones asked plaintiff, "where have you been, have you been in there spreading your legs?"[47] Plaintiff told Jones that his comment "was entirely uncalled for."  Jones laughed, but admitted that he should not have made such a statement.  Donald Smith merely shook his head and laughed.[48]

Another incident occurred while plaintiff, Donald Smith, and Marty Jones were riding in the cab of a Great Barrier truck.  Jones asked plaintiff whether she ever had engaged in an extramarital affair, and whether she would consider an affair with someone who was 30, 34, or 35 years old. Plaintiff initially told Jones that his inquiries were none of his business.  When Jones persisted, plaintiff said that she never had engaged in an affair, and told him to "shut up."  Jones told plaintiff that he did not believe her, and proceeded to talk about his own extramarital relationships. Plaintiff told Jones that whatever he did was none of her business.  Donald Smith said nothing.[49]

---

[46] *Id.* at 108-110.

[47] *Id.* at 111.

[48] *Id.* at 83-84, 111-12.

[49] *Id.* at 102-105; *id.*, Exhibit E (D. Smith deposition), at 8.

8

On another occasion, Marty Jones invited plaintiff to have a drink with him and Donald Smith after work. Plaintiff responded that she did not drink, and that she had no business going out with two men who were going to be drinking.[50]

Plaintiff and her husband drove to the Decatur divisional office during January or February of 1998, and complained to Ann Smith and Kim Cole about each of the previous incidents.[51]  She also complained about the vulgar and offensive language to which she was regularly subjected in the workplace (discussed *infra*, at § I.A.4).[52]  Plaintiff believed that Ann Smith was the divisional office manager, and that Kim Cole was Human Resource Manager for the division.[53]  In fact, however, Smith was classified as a billing and payroll clerk, and Cole worked as an accounts payable clerk. Neither had supervisory authority over employees at the Champion Paper Mill job site, nor were they authorized to receive complaints about sexual harassment.[54]  Nevertheless, Smith and Cole told plaintiff that she should not have to put up with that type of behavior.[55]  When Tim Smith (the Champion site superintendent) and Donald Smith (insulation foreman and, thereby, plaintiff's immediate supervisor) learned of plaintiff's complaints, they told her that she should not lodge complaints about her working environment with anyone outside the Champion Paper Mill job site.[56]

---

[50] *Id.*, Exhibit A (plaintiff's deposition), at 84, 107.

[51] *Id.*, at 98-99; *id.*, Exhibit B (C. Miller deposition), at 52.

[52] Defendant's evidentiary submission (doc. no. 56), Exhibit A (plaintiff's deposition), at 97-98.

[53] *Id.* at 98-99.

[54] *Id.*, Exhibit J (Aycock declaration), ¶¶ 3, 5. Jeff Aycock stated that Ann Smith's employment with Great Barrier was terminated on August 22, 1996. *Id.* ¶ 3. Accordingly, defendant argues that this conversation must have taken place prior to that date. Defendant's brief (doc. no. 61), at 4. In response, plaintiff's husband stated that "Ann Smith left her employment with Great Barrier in 1996, but she later returned to her employment before Sandra and I made our complaint of sexual harassment." Plaintiff's evidentiary submission (doc. no. 64), Exhibit B (C. Miller affidavit), ¶ 3.

[55] Defendant's evidentiary submission (doc. no. 56), Exhibit A (plaintiff's deposition), at 99.

[56] Plaintiff's evidentiary submission (doc. no. 64), Exhibit A (plaintiff's affidavit), ¶ 11.

### 3.     Incidents occurring prior to plaintiff's termination.

Five of the remaining seven specific incidents about which plaintiff complains occurred on indeterminant dates prior to her termination on June 28, 1999.

On one occasion, as plaintiff and a number of other Great Barrier employees were riding in the bed of a pick-up truck, they passed a female security guard at the Champion Paper Mill plant gate. David Thornton, an insulation mechanic, bragged to the other men that "he would like to throw a long hard one to her."[57]  Plaintiff and James Justice, another insulation mechanic, told Thornton to watch his mouth.  Thornton apologized, and said he had forgotten that plaintiff was present.[58]

On another occasion, when plaintiff was riding in the back of a Great Barrier truck, Oather Thornton, an insulation mechanic, was talking to James Justice about eating turnip greens.  Justice stated that "he didn't like them, that he would prefer to be eating a blond; if a blond wasn't available, then a brunette would do."[59]  Plaintiff and Thornton both told Justice to not talk like that. Justice was obviously embarrassed for making the comment.[60]

Another incident concerned Marty Jones' comments to plaintiff about Oather Thornton, a man plaintiff described as "one of those that chews tobacco, so he always has stuff dripping down his face.  And he has a body odor.  And when he bends over you get mooned."[61]  Jones asked plaintiff: "how would you like to go to bed with that, or how would you like to kiss that, or what do you think his sheets look like?"[62]

---

[57] Defendant's evidentiary submission (doc. no. 56), Exhibit A (plaintiff's deposition), at 87.

[58] *Id.* at 85-88.

[59] *Id.* at 93-94.

[60] *Id.* at 93-96.

[61] *Id.*

[62] *Id.* at 100.

On another occasion, when plaintiff was standing in a room with several employees — including all of the foremen, the site superintendent, and Van Caldwell, who was delivering supplies from the Decatur divisional office[63] — Caldwell told a joke about a woman going to the doctor and being diagnosed with "exactly disease": that is, "her ass was exactly like her face."[64] Everyone but plaintiff laughed. Tim Smith, the site superintendent, approached plaintiff and apologized if she was offended.[65]

Another insulator, Jorge Garcia, attempted to hug plaintiff when she allowed him to use her insulation materials to complete a project.[66] Garcia said, "my friend, mi amigo."[67] Plaintiff did not welcome Garcia's action, and pushed him away.[68]

### 4.    Recurring incidents

Three of the thirteen incidents about which plaintiff complained occurred more than once. For instance, Marty Jones often wore his shirt unbuttoned so far down that he was orally reprimanded by the site superintendent, Tim Smith.[69] Jones frequently directed plaintiff's attention to various men, and said "there's one for you," or asked if she would like to "have an affair with that one?"[70] And, any time plaintiff had to ride in the cab of a truck with Marty Jones and Donald Smith, they made sure that she sat between them, which made her uncomfortable.[71] Finally, plaintiff was

---

[63] *Id.* at 120; *id.*, Exhibit B (C. Miller deposition), at 35.

[64] *Id.*, Exhibit A (plaintiff's deposition), at 122.

[65] *Id.* at 121-24.

[66] *Id.* at 159-60. Although plaintiff identified this individual as Jorge Gonzales, the record establishes that his last name was Garcia.

[67] *Id.* at 161.

[68] *Id.* at 159-60.

[69] *Id.* at 110-11; *id.*, Exhibit F (T. Smith deposition), at 140-41.

[70] *Id.*, Exhibit A (plaintiff's deposition), at 101; Plaintiff's evidentiary submission (doc. no. 64), Exhibit A (plaintiff's affidavit), ¶ 3.

[71] Defendant's evidentiary submission (doc. no. 56), Exhibit A (plaintiff's deposition), at 84.

regularly subjected to a barrage of foul language.[72]  In fact, many of the employees at the Champion job site uttered crude and vulgar words virtually every time they spoke.[73]  Tim Smith admitted that, during his employment as Champion job site planner and, later, as site superintendent, most of the male employees regularly used such expletives as "fuck," "crack," "dick," "tits," "ass," "pussy," "shit," "damn," "god damn," "mother fucker," "son of a bitch," "asshole," and "bastard."[74]  Smith also admitted that he heard Marty Jones use many of these words in the presence of plaintiff and her immediate supervisor, Donald Smith.[75]  The employees not only used such language in the presence of plaintiff, but continued to do so after they were warned not to do so by Tim Smith.[76]  Marty Jones admitted that almost all of the male employees, including himself, not only cursed, but talked about sex.[77]

In March of 1999, plaintiff complained about the offensive behavior to which she had been subjected to scaffolding foreman Roger Jones and scaffolding lead man Kenny Brown, who served as scaffolding foreman in Jones' absence.[78]  She was prompted to report the various offenses by Marty Jones' recent comments about kissing and going to bed with Oather Thornton.[79]  Plaintiff told Jones and Brown about all of the vulgar comments to which she had been subjected, but did not mention the names of the individuals who made the comments or engaged in the misconduct.[80]

---

[72] *Id.* at 157.

[73] *Id.* at 157.

[74] *Id.*, Exhibit F (T. Smith deposition), at 133-35 and exhibit 2 (Handwritten list of words commonly heard ath the Champion job site).

[75] *Id.* at 116-20.

[76] *Id.* at 133-35.

[77] *Id.*, Exhibit G (M. Jones), at 65, 69, 76.

[78] *Id.* at 88-89.

[79] Plaintiff's evidentiary submission (doc. no. 64), Exhibit A (plaintiff's affidavit), ¶ 7.

[80] Defendant's evidentiary submission (doc. no. 56), Exhibit A (plaintiff's deposition), at 88-89.  Jones, however, only recalls plaintiff complaining about the comment about the female security guard.  *Id.*, Exhibit D (R. Jones), at 33-36.

Jones and Brown told plaintiff they would do something.[81]  Jones informed Tim Smith of plaintiff's complaint and stated intent to file a harassment charge if the conduct did not stop.[82] Shortly thereafter, Smith gathered the individuals who regularly worked with plaintiff, and instructed them to stop using inappropriate language and discussing inappropriate topics when they were in plaintiff's presence.[83]

Over time, the offensive language and conduct to which plaintiff was subjected began to take its toll on her.  She no longer wanted to go to work in the morning and could not sleep at night.  In general, she felt intimidated by Marty Jones.[84]

**B.    Plaintiff's Gender-Based Wage Disparity Claim**

Although plaintiff complained in her EEOC charge and during deposition that Great Barrier discriminated on the basis of sex by compensating her at a lower rate of pay than any of her male counterparts,[85] her complaint does not include such a claim.  During deposition, she claimed that the male mechanics with whom she worked received an increase in pay exceeding one dollar an hour during October of 1997, resulting in a pay rate of $12.25 an hour,[86] but that she received an increase of only fifty cents, from $10.50 to $11.00 an hour.[87]  Plaintiff complained about this discrepancy, and said that she intended to file a "harassment charge" against the company.[88]  Thereafter, plaintiff's rate of pay was increased to $12.25 an hour, and she was promoted to insulation mechanic

---

[81] Defendant's evidentiary submission (doc. no. 56), Exhibit A (plaintiff's deposition), at 90.

[82] *Id.* at 90-91, 167.

[83] *Id.* at 132-33.

[84] *Id.* at 164-65.

[85] *Id.* at 46-47; Complaint (doc. no. 1), Exhibit A (August 31, 1999 EEOC charge).  It should be noted, however, that neither plaintiff's complaint nor her amended complaint make any mention of the difference in pay.  In fact, both plaintiff's complaint mentions only sexual harassment.

[86] Defendant's evidentiary submission (doc. no. 56), Exhibit A (plaintiff's deposition), at 46-47.

[87] *Id.*

[88] *Id.* at 166-67.

during November of 1997.[89]

### C.    Plaintiff's Termination

Plaintiff's adult son was seriously injured in an automobile accident on Saturday, April 3, 1999, requiring intensive care and numerous surgical procedures.[90]  Plaintiff asked her insulation foreman, Donald Smith, for time off to care for her son, and he agreed.[91]  She subsequently called Tim Smith, the Champion Paper Mill job site superintendent, who also told her to take some time off to care for her son.[92]  Great Barrier permitted plaintiff an extended leave, and continued paying for her health insurance during the period she was off work.[93]  Plaintiff telephoned the site superintendent, Tim Smith, at least once a week, to advise him of her son's condition.[94]

Tim Smith telephoned plaintiff at her home during the week of June 21, 1999, to ask when she expected to return to work.[95]  Plaintiff said that she did not know, because her son was scheduled for six to eight weeks of physical therapy.[96]  She said, "it may not take that long, [but] we would just have to kind of play it by ear."[97]  Tim Smith testified that he told plaintiff: "I really needed to know a date when she was coming back to work.  She had been off for an extended period of time, *and I told her I wanted her to think about it, and that I would be giving her a call the following week.*"[98]  Plaintiff, on the other hand, testified that Smith said it "would be fine" for her to remain off-work for an additional six to eight weeks, while her son was undergoing physical therapy, because "I

---

[89] *Id.* at 46-47.

[90] *Id.* at 135, 137.

[91] *Id.* at 136-37.

[92] *Id.* at 137.

[93] *Id.* at 138.

[94] *Id.* at 137.

[95] *Id.*, Exhibit F (T. Smith deposition), at 79-81.

[96] *Id.* at 81.

[97] *Id.*, Exhibit A (plaintiff's deposition), at 139.

[98] *Id.*, Exhibit F (T. Smith deposition), at 81 (emphasis supplied).

would be coming back about the same time that Marty [Jones] would be getting back from his knee surgery."[99]

In any event, Smith called plaintiff again on Monday, June 28, 1999 — twelve weeks after she began her leave of absence[100] — and told her that she had to return to work the following day, or she would be terminated.[101] Plaintiff told Smith that she could not return to work on such short notice, because she still was driving her son to various treating physicians and physical therapy sessions. Plaintiff testified that she could have returned to work a few days later but she did not tell Smith that she could, because he did not give her the opportunity.[102] Smith told plaintiff that he was terminating her employment, and that she needed to pick up her tools.[103] Plaintiff went to the Champion job site on July 1, 1999, for the last time, to pick up her tools.[104]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on August 31, 1999, alleging discrimination on the basis of sex, sexual harassment, and retaliation.[105] She initiated this action on October 19, 2000.[106]

---

[99] *Id.*, Exhibit A (plaintiff's deposition), at 139.

[100] It should be observed at this juncture that the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654, entitles an eligible employee to as many as twelve weeks of leave each year to care for a "serious health condition" suffered by the employee personally, or the employee's child, spouse, or parent. *See* 29 U.S.C. § 2612(a)(1).

　　　To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: *interference claims*, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and *retaliation claims*, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)91) & (2),; 29 C.F.R. § 825.220(c).

*Strickland v. Water Works and Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (emphasis added). Significantly, however, plaintiff has not pled any claims based upon the FMLA.

[101] *Id.*, Exhibit A (plaintiff's deposition), at 138, 140-44.

[102] *Id.* at 141-43.

[103] *Id.* at 144.

[104] *Id.* at 151.

[105] Complaint (doc. no. 1), Exhibit A (August 31, 1999 EEOC charge).

[106] Complaint (doc. no. 1).

## II. DISCUSSION

### A.   Plaintiff's Motion to Strike

Plaintiff has moved to strike portions of the Declaration of Jeff Aycock, arguing that it fails to satisfy the requirements of Rule 56: *i.e.*, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Plaintiff also argues that Aycock's testimony constitutes inadmissable hearsay.

Aycock states, in the first paragraph of his declaration, "I have personal knowledge of the facts set forth in this Declaration."[107] He goes on to add, "I am the Chief Financial Officer for Great Barrier Insulation Co., and I have held this position since 1993."[108] As such, Aycock is competent to testify as to the employment history of Great Barrier's employees. Accordingly, the declaration satisfies the requirements of Rule 56(e). Further, because Aycock states that he has personal knowledge of the facts set forth in the declaration, the testimony is neither hearsay, barred by Federal Rule of Evidence 802.

### B.   Defendant's Motion for Summary Judgment

#### 1.   Gender-based wage disparity claim

Plaintiff testified during deposition that she was discriminatorily paid less than her male counterparts for a period of less than two months.[109] Her complaint, however, does not allege that she was paid less than similarly situated male employees. Thus, with respect to her claim that Great Barrier discriminated against her by paying her less than male comparitors, the complaint fails to

---

[107] Defendant's evidentiary submission (doc. no. 56), Exhibit J (Aycock declaration), ¶ 1.

[108] *Id.* at ¶ 2.

[109] *See supra* notes 87-91 and accompanying text.

16

set forth a "short and plain statement ... showing that the pleader is entitled to relief." Fed. R. Civ.

P. 8(a)(2).  "Plaintiff's references to unpled incidents of alleged discrimination ... throughout the

conduct of discovery [are] no substitute for the factual allegations of a complaint required by Federal

Rule of Civil Procedure 8." *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1358 (11th Cir.

1998) (citing *Coon v. Georgia Pacific Corp.*, 829 F.2d 1563 (11th Cir. 1987)).  Further, it makes no

difference that plaintiff stated in her August 31, 1999 EEOC charge that she "was treated differently

from [her] male co-workers, and, for a period of time, paid less than similarly situated males with

less experience."  The mere fact that such a claim was within the scope of plaintiff's EEOC charge

does not relieve her from the pleading requirements of Rule 8.  *See Coon*, 829 F.2d at 1569-70.

Accordingly, plaintiff's claim for a gender-based wage disparity cannot be maintained and is due

to be dismissed.

### 2.    Sexual harassment

Plaintiff contends that she was subjected "to a sexually hostile work environment within the

meaning of 29 C.F.R. § 1604.11(a)."[110]  The cited regulation provides:

> Harassment on the basis of sex is a violation of Sec. 703 of Title VII.  Unwelcome
> sexual advances, requests for sexual favors, and other verbal or physical conduct of
> a sexual nature constitute sexual harassment when (1) submission to such conduct
> is made either explicitly or implicitly a term or condition of an individual's
> employment, (2) submission to or rejection of such conduct by an individual is used
> as the basis for employment decisions affecting such individual, or (3) such conduct
> has the purpose or effect of unreasonably interfering with an individual's work
> performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a) (2001) (footnote omitted).

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an

employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against

---

[110] Complaint (doc. no. 1), ¶ 19.

any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...."  42 U.S.C. § 2000e-2(a)(1).  That statutory language does not mention, let alone define, "sexual harassment."[111]  Even so, the Supreme Court held in *Meritor Savings Bank, FSB v. Vinson* that "unwelcome sexual advances that create an offensive or hostile working environment violate Title VII.  Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex."  477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).  The *Meritor* Court went on to say that Title VII is violated, and sexual harassment is actionable, whenever the workplace is permeated with "discriminatory intimidation, ridicule, and insult," *id.* at 65, 106 S.Ct. at 2405, that is "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

To establish a prima facie sexual harassment claim, a plaintiff must demonstrate that:  (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon the plaintiff's sex; (4) the harassment complained of was sufficiently severe or pervasive as to alter the terms and conditions of the plaintiff's employment, and created a discriminatorily intimidating, hostile, or abusive working environment; and (5) a basis for holding the employer liable.  *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742,

---

[111] "The prohibition against discrimination based on sex was added to Title VII at the last minute on the floor of the House of Representatives." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (citing 110 Cong.Rec. 2577-2584 (1964)).  As a consequence, "we are left with little legislative history to guide us in interpreting the Act's prohibition based on 'sex.'" *Id.* at 64, 106 S.Ct. at 2404.

118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.

1999) (en banc); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000); *Cross v.*

*State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d

1497, 1502-03 (11th Cir. 1985); *Henson*, 682 F.2d at 903-05.

It is the fourth element of a prima facie case that "tests the mettle of most sexual harassment

claims." *Gupta*, 212 F3d at 583.

> Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment. The paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands. *Burlington Indus.*, 118 S.Ct. at 2265 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."). In such a case, traditionally described as quid pro quo harassment, the "discrimination with respect to terms or conditions of employment [is] explicit." *Id*. at 2264; *see also Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 (11th Cir. 1998).

> Absent such "explicit" discrimination, an employee must make some showing in order to connect allegations of sexual harassment to a violation of Title VII. Thus, in the cases traditionally described as hostile-environment cases, an employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. [at] 2399 (quoting *Henson*, 682 F.2d at 904).

*Mendoza*, 195 F.3d at 1245-46.

"A recurring point" in Supreme Court opinions "is that 'simple teasing,' ... offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788, 118 S.Ct. at

2283 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998,1003,

140 L.Ed.2d 201 (1998)); *see also DeAngelis v. El Paso Municipal Police Officers Association*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy [a woman's] equal opportunity in the workplace.").

Furthermore, "incidents of environmental sexual harassment must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher*, 524 U.S. at 787 n.1, 118 S.Ct. at 2283 n.1 (citation and internal quotation marks omitted); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. ... Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. ... We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment....

*Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84 (citations and internal quotation marks omitted).

When assessing the severity or pervasiveness of sexual harassment claims, district courts are instructed to "consider the alleged conduct in context and cumulatively," and, to "look at the totality of the circumstances." *Mendoza*, 195 F.3d at 1242. "The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id.* at 1246 (citations omitted).

The real social impact of workplace behavior often depends on a constellation of

20

> surrounding circumstances, expectations, and relationships which are not fully
> captured by a simple recitation of the words used or the physical acts performed.
> Common sense, and an appropriate sensitivity to social context, will enable courts
> and juries to distinguish between simple teasing or roughhousing among members
> of the same sex, and conduct which a reasonable person in the plaintiff's position
> would find severely hostile or abusive.

*Oncale*, 523 U.S. at 81-82, 118 S.Ct. at 1003.

Further, the harassing conduct complained of must be evaluated from two perspectives: one

subjective and the other objective.

> Conduct that is not severe or pervasive enough to create an objectively hostile or
> abusive work environment — an environment that a reasonable person would find
> hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not
> subjectively perceive the environment to be abusive, the conduct has not actually
> altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993);

*see also, e.g., Mendoza*, 195 F.3d at 1246. As the Supreme Court recently explained in *Faragher*

*v. City of Boca Raton*, the objective component of the severe or pervasive element prevents "the

ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related

jokes, and occasional teasing" from falling under Title VII's broad protections. 524 U.S. at 788, 118

S.Ct. at 2284.

The Eleventh Circuit has observed that the "objective component of this analysis is

somewhat fact intensive." *Mendoza*, 195 F.3d at 1246. Even so, that does not mean the issue must

be submitted to a jury. To the contrary, the Supreme Court and Eleventh Circuit have identified four

factors that *courts* should compare to the conduct complained of when determining, as a matter of

law, whether alleged acts of harassment "objectively altered an employee's terms or conditions of

employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the

conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the

conduct unreasonably interferes with the employee's job performance." *Id.* (citing *Harris*, 510 U.S. at 23, 114 S.Ct. at 371; *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)); *see also Gupta*, 212 F.3d at 584 ("There are four factors that we consider in determining whether [the sexual or gender-related statements and conduct] are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment.").

District courts are compelled to carefully compare the four enumerated factors to the conduct complained of by a plaintiff, so as to avoid "trivializ[ing] true instances of sexual harassment." *Mendoza*, 195 F.3d at 1252 n.10. "These factors ... delineate a minimum level of severity or pervasiveness necessary [as a matter of law] for harassing conduct to constitute discrimination in violation of Title VII." *Id.*, at 1246.[112] If district courts allow hostile work environment claims to go forward on the basis of facts that do not demonstrably meet or exceed the enumerated standards, that "would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would 'trivialize true instances of sexual harassment.'" *Gupta*, 212 F.3d at 586 (quoting *Mendoza*, 195 F.3d at 1252 n.10).

"It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory." *Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999).

In fact, the "mere utterance" of sexually explicit epithets and derogatory statements "which engender offensive feelings in an employee" is *not* actionable. *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957,

---

[112] In *Mendoza*, the Eleventh Circuit determined *en banc* that the conduct complained of by the plaintiff was "*insufficient as a matter of law* to sustain hostile-environment claims." 195 F.3d at 1252 & n. 10 (emphasis supplied).

92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).  That is because "Title VII does not attempt to purge the workplace of vulgarity," *Hopkins v. Baltimore Gas and Electric Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (internal quotation marks and citation omitted), nor did Congress "expect employers to purify the language in the workplace or remove all vulgarity or coarse comments." *Johnson v. Hondo, Inc.*, 940 F. Supp. 1403, 1410 (E.D. Wis. 1996).  Moreover, conduct which amounts to "mere locker room antics, joking, or horseplay" also is beyond the purview of Title VII.  *Tietgen v. Brown's Westminster Motors, Inc.*, 921 F. Supp. 1495, 1501 (E.D. Va. 1996).[113]

Applying the foregoing principles to the facts of this case, the court concludes that plaintiff has failed to establish a prima facie case of sexual harassment.  None of the incidents about which plaintiff complains, regardless of whether they are considered individually or in combination, was objectively severe enough to alter the terms and conditions of her employment.  Rather, the conduct typifies the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84.

Further, the listed conduct was not sufficiently pervasive to alter the terms and conditions of plaintiff's employment.  Although the exact period of time during which the objectionable behavior occurred is unclear, the record establishes that it began prior to October of 1997, and continued until plaintiff's last day of actual work on Friday, April 2, 1999.  Fourteen incidents spread over an eighteen month to two year span amounts to no more than isolated or sporadic

---

[113] *See also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) (to be deemed pervasive, the conduct must be more than episodic; it must be sufficiently continuous and concerted), *overruled on other grounds by Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2362, 105 L.Ed.2d 132 (1989); *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983) (isolated incidents generally not sufficient to create hostile working environment); *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (relatively isolated incidences of non-severe conduct do not rise to the level of a hostile environment); *Christoforou v. Ryder Truck Rental*, 668 F. Supp. 294, 301 (S.D. N.Y. 1987) (Although the level of behavior needed to create a hostile environment "cannot be precisely defined," it is "clearly more abusive, pervasive and persistent" than three specific incidents of sexual harassment over an 18 month period.).

behavior; certainly, it does not constitute conduct that is sufficiently pervasive to support a hostile

work environment claim. *See e.g., Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d

871, 872-75 (5th Cir. 1999) (finding several incidents over a two year period, including a comment

that "your elbows are the same color as your nipples," another comment that plaintiff had big thighs,

touching plaintiff's arm, and attempts to look down plaintiff's dress, were insufficient to support a

hostile work environment claim); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1366, 1366 (10th Cir.

1997) (five sexually-oriented incidents over sixteen months were sporadic and not pervasive).

### 3.    Retaliation

Plaintiff also contends that she was discharged in retaliation for complaining about the

harassing conduct to which she was subjected. "Retaliation is a separate violation of Title VII."

*Gupta*, 212 F.3d at 586.  Section 704(a) of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §

2000e-3(a)) provides protection for employees who oppose or participate in activities to correct an

employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees or applicants for employment ... because he [the
> employee] has opposed any practice made an unlawful employment practice by this
> subchapter [of Title VII], or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding, or hearing under this
> subchapter [of Title VII].

42 U.S.C. § 2000e-3(a).

A plaintiff must prove three elements to establish a prima facie retaliation claim:  (1) she

engaged in statutorily protected activity; (2) she suffered an adverse employment action; (3) there

was a causal linkage between the protected activity and the adverse employment action. *See, e.g.,*

*Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta*, 212 F.3d

at 587; *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Wideman*

*v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

In addition, when — as here — a retaliation claim is based upon conduct falling under the opposition clause of 42 U.S.C. § 2000e–3(a), the plaintiff also must demonstrate a good faith, reasonable basis for believing that the underlying, allegedly harassing conduct constituted a violation of Title VII, as distinguished from proving that the employer actually engaged in an unlawful employment practice. *See, e.g., Gupta*, 212 F.3d at 586 ("To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to her protest, so long as she had a reasonable good faith belief that the discrimination existed.") (quoting *Meeks*, 15 F.3d at 1021) (internal quotation marks omitted); *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989) ("[P]laintiff need only have had a 'reasonable belief' that an unlawful employment practice was occurring.").

For purposes of summary judgment the court assumes that plaintiff possessed a good faith, reasonable basis for complaining to Roger Jones and Kenny Brown in March of 1999 and, thus, that she has satisfied the first element of a prima facie case. Further, her discharge clearly constitutes an adverse employment action. The remaining element, however, requires closer scrutiny.

When a plaintiff fails to present any evidence of a causal linkage between her protected activity and the alleged adverse employment action inflicted in retaliation therefor, the court must dismiss the claim. *See, e.g., Bailey v. USX Corp.*, 850 F.2d 1506, 1508 (11th Cir. 1998); *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986); *Hamm v. Members of Board of Regents of State of Florida*, 708 F.2d 647, 654 (11th Cir. 1983). The causation requirement is not onerous, however:

rather, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks*, 15 F.3d at 1021 (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). Stated somewhat differently, "a plaintiff must show that the decisionmakers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 212 F.3d at 590 (quoting *Farley*, 197 F.3d at 1337) (internal quotation marks omitted). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecommunications, Inc.* 231 F.3d 791, 798-99 (11th Cir. 2000).

Here, the person who made the decision to terminate plaintiff's employment — Tim Smith, defendant's site superintendent — unquestionably was aware of plaintiff's complaints. Roger Jones, scaffolding foreman, told him in March of 1999. Smith assembled the male employees who regularly worked with plaintiff, and instructed them to stop using inappropriate language, and discussing inappropriate topics, in her presence. Plaintiff relies on the temporal proximity between that action and her termination on June 28, 1999, some three or more months later, to establish that the events were not wholly unrelated.

Unquestionably, "a close temporal proximity between ... two events may support a finding of a causal connection between those two events." *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (stating "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection")); *see also, e.g., Bass*, 256 F.3d at 1119 ("Close temporal proximity between the protected activity and the adverse action may be sufficient

to show that the two were not wholly unrelated.") (citing *Gupta*, 212 F.3d at 590 ("For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'") (in turn quoting *Farley*, 197 F.3d at 1337)).

When a plaintiff attempts to satisfy the causal relationship requirement on the basis of a close temporal proximity between protected activity and a subsequent adverse action, however, the Eleventh Circuit requires that the interval between events be very brief. In *Bass*, for example, the plaintiff began to suffer adverse employment actions very quickly after filing an EEOC charge on December 19, 1995:

> In December 1995, on his first day as a Training Instructor, Bass was assigned to clean out a warehouse — work ordinarily done by inmates supplied by the Department of Corrections. Between December 1995 and April 1996, Bass had no routine work assignment, performed custodial and clerical duties, and usually was supervised by personnel who were less senior than he. Middleton, who was in charge of the Training Instructors, and Chief Smith ordered Bass not to record on his work logs the custodial and clerical work he was performing.

*Bass*, 256 F.3d at 1101. The Eleventh Circuit found that "[t]he close temporal proximity between filing of the EEOC complaint and the adverse actions is sufficient in this case to satisfy the third prong of the prima facie case of retaliation." *Bass*, 256 F.3d at 1119. Moreover, in *Donnellon v. Fruehauf Corp.*, 794 F.2d 598 (11th Cir. 1986), a case in which "the defendant's witnesses never articulated clearly and consistently the reason that the plaintiff was discharged," the Eleventh Circuit nevertheless held that there was substantial evidence that the plaintiff was discharged in retaliation for filing a sex discrimination complaint, *including the fact that she was discharged less than one month after filing her complaint.*

In *Wascura*, on the other hand, the Eleventh Circuit held that a three and one-half month

interval between a plaintiff's notice to her employers of her need for extended leave, because of her son's terminal illness, and her subsequent termination did *not*,

> standing alone, show that the City's articulated reasons for her termination were pretextual, *see e.g.*, *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (holding that four-month time lag between plaintiff's participation in protected activity and his termination was, by itself, insufficient to justify an inference of causation); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming district court's holding that three-month period of time between plaintiff's protected activity and termination was, standing alone, insufficient to establish a causal connection).

257 F.3d at 1245; *see also id.* at 1248 ("In light of the other evidence in the record, the three and one-half month temporal proximity is insufficient to create a jury issue on causation.").

Other circuits also have concluded that the temporal proximity between protected activity and an adverse employment action must be "very close" when it is the primary basis for concluding that a causal nexus exists. *See O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) ("Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171 , 1179 (10th Cir. 1999) (holding that three month period, standing alone, is insufficient to establish causation); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (finding four month period of time between plaintiff's protected activity and the receipt of disciplinary letters was insufficient to establish a causal connection).

Based upon the foregoing authorities, this court concludes that plaintiff has failed to establish a causal connection between her complaints and subsequent termination, based upon the temporal proximity of the two events.

Even if this court should be wrong in that conclusion, however, plaintiff still has not demonstrated that defendant's stated nondiscriminatory reason for her termination was pretextual.

28

Plaintiff has not disputed that, during the period she was on leave, Tim Smith came under increasing pressure from Johnny McKay, the Champion Paper Mill project manager responsible for overseeing Great Barrier's maintenance contract,[114] "to reduce Great Barrier's workforce and be prepared for changes in Champion's work requirements. The work Champion required Great Barrier to perform changed on a regular basis and, consequently, so did Great Barrier's manpower requirements."[115] In the words of Tim Smith, who has been a sales representative for Brand Scaffold Builders since October of 2000:[116]

> 7. By early June 1999, I was receiving constant pressure to reduce Great Barrier's workforce to meet the diminished needs of Champion. To be able to effectively schedule Great Barrier employees and determine whether I needed to reduce the workforce, I needed to know when Sandra Miller would be able to return to work. Approximately a week to ten days before Sandra Miller's employment was terminated on June 28, 1999, I contacted Sandra Miller at her home and asked her when she was going to be able to come back to work. She told me she did not know when she would be able to return to work. I told her that I wanted her to think about it, and that I would be giving her a call the following week.

> 8. On June 28, 1999, I contacted Sandra Miller again at her home and again asked her when she would be returning to work. She advised me that she would not return to work at that time and she did not give me a date as to when she was planning or would be able to return to work. At this time I decided to terminate her employment.

> 9. I terminated the employment of Sandra Miller on June 28, 1999 because she was unable to return to work and had failed to advise me of when she would be able to return to work. I needed to know when Miller could return to work so that I could schedule great Barrier's workforce accordingly and determine how many and which employees might need to be laid off or transferred. During the period from June 6, 1999 through August 11, 1999, Great Barrier reduced its hourly workforce at the Champion site from 18 to 14 employees.[117]

Laying to one side the dispute between plaintiff and Tim Smith regarding the first telephone call,

---

[114] Defendant's evidentiary submission (doc. no. 56), Exhibit I (T. Smith declaration), ¶ 3.

[115] *Id.* ¶ 6.

[116] *Id.* ¶ 1.

[117] *Id.* ¶¶ 7 - 9.

plaintiff still has not refuted the core of Smith's testimony that plaintiff was selected as one of the four hourly employees laid off between June 6 and August 11, 1999, "because she was unable to return to work and had failed to advise me of when she would be able to return to work," other than to say "we would just have to kind of play it by ear."[118]

### III. CONCLUSION

For the foregoing reasons, the Board's motion for summary judgment is due to be granted on all of plaintiff's discrimination, sexual harassment, and retaliation claims. With the dismissal of plaintiff's Title VII claims, the basis for this court's exercise of original jurisdiction disappears. The court, therefore, exercises its discretion and dismisses plaintiff's remaining state law claims without prejudice to her right to assert them in an appropriate state forum. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction ...."); *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 619 n.7, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise supplemental jurisdiction over the remaining state-law claims.").

An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this ____9th____ day of January, 2002.

---

[118] *Id.*, Exhibit A (plaintiff's deposition), at 139.

United States District Judge

31